## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 15 2018, 8:51 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Don R. Hostetler
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of E.R., M.R., and K.R., Minor Children, and T.R., Mother<br><br>*Appellant-Respondent*,<br><br>v.<br><br>The Indiana Department of Child Services,<br><br>*Appellee-Petitioner*. | February 15, 2018<br><br>Court of Appeals Case No. 49A02-1708-JT-1929<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Marilyn A. Moores, Judge<br><br>The Honorable Larry Bradley, Magistrate<br><br>Trial Court Cause Nos.<br>49D09-1605-JT-542<br>49D09-1605-JT-543<br>49D09-1605-JT-544 |

**Brown, Judge.**

[1] T.R. ("Mother") appeals the involuntary termination of her parental rights with respect to E.R., M.R., and K.R. (the "Children"). Mother raises three issues which we restate as whether the trial court erred in terminating her parental rights. We affirm.

## Facts and Procedural History

[2] In November 2013, Mother was arrested in Hendricks County and charged with possession of marijuana and driving while suspended as Class A misdemeanors and was released on her own recognizance in February 2014. On March 12, 2014, the Department of Child Services ("DCS") filed a verified perition alleging that E.R., born on September 30, 2010, M.R., born on November 3, 2011, and K.R., born on February 11, 2014, were children in need of services ("CHINS"), that Mother and K.R. tested positive for marijuana at the time of K.R's birth, that Mother had a history of substance abuse, and that M.R. had likewise tested positive for marijuana at her birth. DCS also alleged that Mother had recent DCS history related to domestic violence and allowed the Children to reside in a home with a convicted child molester.

[3] The same day, the court held an initial hearing and ordered that the Children remain in Mother's care contingent upon her completion of a substance abuse assessment and that she follow all recommendations, submit to random drug screens, and participate in home-based services, with drug screens and the assessment to be implemented within forty-eight hours. At some point in March 2014, guardian ad litem Jamie Walden ("GAL Walden") was assigned to the Children's case and home-based therapist Aiesha Ward was assigned to

Mother. Also, at some point during the spring of 2014, home-based therapist Gabrielle Young was assigned to E.R. and M.R.

[4] On March 25, 2014, Mother was charged in Hamilton County with operating while intoxicated, endangering a person as a class A misdemeanor, driving while suspended as a class A misdemeanor,[1] and operating a vehicle with an alcohol concentration between 0.08 and 0.15 as a class C misdemeanor. On May 12, 2014, DCS filed a request for removal from Mother's care and request for a detention hearing and findings, alleging that "due to mother's failure to participate in substance abuse treatment, failure to submit to random drug screens, failure to provide the [Children] with a safe home free from break-ins, with basic necessities of food, there is an imminent safety threat to the [Children] in [Mother's] care," and attached a prepared affidavit by family case manager Courtney Brinkers ("FCM Brinkers"). Exhibits at 37. The same day, the court denied DCS's request for removal and ordered that the Children remain in Mother's care and found in its dispositional order that reasonable services had been offered and were available for the purposes of preventing or eliminating the need for removal of the Children. The dispositional order also "advised [Mother] that failure to participate as required by a Parental

---

[1] At some point during the CHINS case, DCS became concerned that Mother continued to drive despite her license being suspended. On or about January 25, 2010, Mother was determined guilty in Marion County of a false or fictitious registration; on or about April 5, 2010, she defaulted in Marion County for a having false or fictitious registration; on or about May 21, 2012, she pled guilty in Carmel to driving with a suspended license; on or about May 22, 2012, she defaulted in Marion County for driving with a suspended license; and, on or about September 19, 2012, she pled guilty in Hamilton County to driving with a suspended license with a prior within ten years.

Participation Order under Ind. Code 31-34-20-3 can lead to the termination of the parent-child relationship under Ind. Code 31-35." *Id.* at 44. The court's May 12, 2014 parental participation order stated that Mother was to complete home-based counseling, substance abuse assessment, and random drug screens. The same day, the court conducted a fact-finding hearing in which it adjudicated the Children as CHINS after accepting Mother's admission and agreement on services, in which Mother admitted that she and K.R. "were both positive for marijuana at the time of [K.R.'s] birth," that she "agrees to maintain suitable housing with adequate bedding, functional utilities, adequate supplies of food and food preparation facilities, and the home shall remain clean and safe for all those residing therein," and that she "shall refrain from the use of illegal drugs." *Id.* at 57-58.

[5] On July 7, 2014, DCS filed a notice of removal from Mother's care, a request for continued placement outside of Mother's care and for a detention hearing and findings in which it stated that "due to mother's incarceration, she is unable to provide basic care and supervision for the [Children]," and attached an affidavit by FCM Brinkers. *Id.* at 64. The affidavit stated that the Children were removed from Mother's care on July 3, 2014, and that, on the same day, Brinkers was informed by therapist Ward that Mother "had been held in the Marion County jail since 6/28/14 for an outstanding warrant in Hendricks

County."[2]  *Id.* at 67.  On July 9, 2014, the court held a detention hearing, found that removal of the Children was necessary, and granted wardship to DCS. Mother requested that they be placed in the kinship care of Brandy, who Mother referred to as her sister. At some point, Mother moved in with Brandy and DCS became concerned about continued substance use by both Mother and Brandy.  At some other point, Mother told FCM Brinkers about her concern that Brandy was using drugs and the Children were placed in foster care.

[6]     On August 7, 2014, Mother pled guilty in Marion County to possession of marijuana.  At an August 13, 2014 review hearing in the CHINS case, the court authorized temporary trial visits with Mother once beds were in the home.[3] Mother pled guilty in Hendricks County to possession of marijuana and driving while suspended charges and, on October 28, 2014, she was sentenced to 180 days in jail with credit for 44 days and placed on reporting probation.  On December 3, 2014, Mother pled guilty in Hamilton County to one count of operating a vehicle while intoxicated endangering a person as a Class A misdemeanor.[4] On December 4, 2014, the Hendricks County court issued a

---

[2]  A CCS entry on July 10, 2014, indicates that Mother was served with a misdemeanor arrest warrant for failing to appear at her Hendricks County bench trial in April 2014, and the entry that immediately follows states that Mother was "remanded to the Hendricks County Sheriff with NO BOND until 7/20/2014 and then may post a bond of $300.00 cash." Exhibits at 132.

[3] By November 19, 2014, the Children were in temporary trial visits with Mother.

[4] The CCS in the Hamilton County case reveals that Mother did not appear for her January 5, 2015 sentencing hearing and that the court ordered a warrant for her arrest on January 6, 2015.

warrant for Mother for a probation violation, she was incarcerated in the Hamilton County case starting February 5, 2015, and at some point before February 25, 2015, the Children were placed in relative care.

[7] On April 9, 2015, Mother was served the arrest warrant from her Hendricks County case. After it held an evidentiary hearing on May 14, 2015, the court sentenced Mother to 180 days in jail with credit for 54 days and 126 days suspended. On May 27, 2015, Mother appeared at the periodic review hearing in the CHINS case and requested that the Children be placed with their paternal grandparents. At some point before October 28, 2015, however, the Children were transferred to therapeutic foster care.

[8] Family case manager Andrenesia Gray ("FCM Gray") was assigned to the case in June 2015. In July 2015, Mother moved to Putnamville to live with her mother. FCM Gray made referrals for Mother to attend Cummins in Putnam County for mental health and substance abuse treatment. Also, at some point in July, Mother's referral to therapist Ward stopped because Mother had moved out of Ward's service area, and Ward recommended that Mother continue participating in home-based therapy. In September 2015, FCM Brinkers stopped serving as the family case manager. When she left the case, FCM Brinkers still had concerns about Mother's parenting that included Mother's continued substance use, her parenting and discipline, her denial of E.R. and M.R.'s sexually reactive behaviors, and E.R. and M.R.'s disclosures that they had been touched innappropriately by the registered sex offender who Mother had lived with and that domestic violence had occurred in the home.

[9] The CHINS court held an October 28, 2015 periodic review hearing at which Mother's counsel reported that Mother was to begin with Cummins and the court ordered DCS to investigate Mother's home. FCM Gray went to the home, Mother became irate when they discussed visitations and called her "a black n----- b----," and FCM Gray requested to be transferred from the case. Transcript Volume 2 at 62. On January 19, 2016, the Hendricks County court revoked Mother's probation and sentenced her to 180 days with 47 days served.[5] On February 3, 2016, the CHINS court held a permanency hearing and found that May 18, 2016, was a projected date for the Children to return home.

[10] In May 2016, Mother was arrested and, on May 20, 2016, DCS filed its verified petition for involuntary termination of her relationship with the Children. At the June 8, 2016 permanency hearing, the court changed the permanency plan from reunification to adoption after finding, in part, that no service provider had recommended the Children return to Mother, that Mother had not completed services designed to enhance her abilities to parent and last saw the Children in March 2016, and that it was unknown if Mother had housing or employment as she did not maintain contact with DCS.

[11] On June 10, 2016, the CHINS court held an initial hearing regarding the involuntary termination of the parent-child relationship and appointed a

---

[5] The court's order revoking probation related to a probation violation for which it had issued a criminal summons on September 9, 2015.

guardian ad litem for the Children.[6] In August 2016, family case manager Tyvondra Gadson ("FCM Gadson") was assigned to the case. At the end of the same month, Mother was released from incarceration for work release and on October 13, 2016, asked the CHINS court to appoint her a public defender in the termination hearing. In November 2016, guardian ad litem Sherron Anderson ("GAL Anderson") was appointed to the case.

[12] On June 22, 2017, Mother was arrested and charged in Clay County as a level 6 habitual traffic violator. The CHINS court commenced the termination trial on July 7, 2017, and Mother appeared telephonically because she was incarcerated and awaiting sentencing in Clay County.

[13] FCM Brinkers testified that when DCS requested removal, there were some concerns after placement in temporary trial visits "with [Mother] or with the in-home CHINS that [Mother] was continuing to use marijuana, that there was some neglect occurring, that the [Children] were not taken to doctor appointments, [there was a] lack of resources," and that Mother continued to live with a registered sex offender and he was providing childcare for the Children. *Id.* at 10. She testified that she referred Mother to home-based therapy after the initial hearing and Mother did not complete it; that she referred Mother to participate in random drug screens but, when they had

---

[6] Mother did not appear at either the initial hearing or the continued initial hearing. When Mother did not appear at the second continued initial hearing, the court set the matter for a default as to Mother, but converted it back to a continued initial hearing by its own motion on October 13, 2016.

conversations, Mother would have reasons that she was not able to participate or refused to participate; and that when she spoke with Mother about her drug use that Mother "was very adamant that marijuana was a plant[,] that it wasn't really a drug and that she didn't understand why she needed to stop using." *Id.* at 13. She also testified that Mother did not rectify the issues that initially led DCS to believe that a substance abuse assessment was necessary during the time FCM Brinkers was on the case; that when Mother was out of incarceration, she would "make appointments, keep some and then disengage"; that Mother denied E.R. and M.R.'s allegations that domestive violence occurred between her and K.R.'s father that involved screaming, hitting, and Mother being dragged by her hair; and that there were several times when she would come to the home with the Children unsupervised in the yard or not appropriately supervised in the home. *Id.* at 15. She further stated that Mother's parenting involved "just constant screaming" and that she became concerned about Mother's mental health as a result of her aggressive outburst towards FCM Brinkers and other providers and "then she'd become very friendly with providers, friendly towards [FCM Brinkers] and then become aggressive again." *Id.* at 18, 21-22.

[14] She also testified that at two different points Mother had housing when the Children were in her care; that in the first house, the Children were sleeping on the couch or a mattress in the front room because Mother did not have beds for them; that a week after relocating to the first house "some people busted through the front door and held . . . her at gun or knife point," were "very

violent with her" when the Children were present, and were "looking for her boyfriend or someone she knew and so they destroyed the house." *Id.* at 22. She stated that the second house had several safety concerns that made it hazardous for the Children due to their age; that when she warned Mother that driving with a suspended license would result in jail and in DCS being called, Mother did not view that as an issue; and that at some point Mother said, "I don't really need this service or any other services. I don't need DCS in my life." *Id.* at 27. On redirect, FCM Brinkers testified that M.R. and E.R. had rashes at several points all over their arms and legs and had instances of lice, that M.R. had a "really bad cold that escalated to bronchitis at one point," and K.R. had some issues with his breathing and with the formation of his head. *Id.* at 58.

[15] FCM Gadson testified that when she was transferred to the case in August 2016, the services that should have been in place for Mother included home-based therapy, home-based case management, a substance abuse assessment, and, to FCM Gadson's belief, domestic violence services; that no open referral for home-based therapy existed because no one knew the location of Mother at that time; and that Mother completed random drug screens through work release, but did not complete any through DCS. She stated that, to her knowledge, Mother had not participated in any drug screens, services, or drug treatment programs since being discharged from work release during the spring of 2017; that she spoke to Mother about participating in services over the phone and asked for good contact information and an address so that DCS could refer

services for her; that Mother provided her with five numbers where she could be reached and explained that she did not have a stable address at that time; and that FCM Gadson attempted those five phone numbers but was unsuccessful at reaching Mother. Further, she testified that Mother had not rectified the issues that initially led DCS to believe that substance abuse assessment, home-based therapy, and home-based case management were necessary; and that she was concerned with Mother's ability to provide a stable home and financially support the Children. When asked if she believed that termination of the parent-child relationship between Mother and the Children was in their best interest, FCM Gadson replied affirmatively and testified that the Children need the permancy that adoption would provide.

[16] Therapist Young testified:

> [E.R] specifically reported an incident to me with a man . . . that sounded inappropriate in terms of she had said that he had asked her to go to the bathroom and he used the bathroom, but I believe her pants were down or something her behind was exposed. She never went like fully into that, but that was definitely a concerning incident that I know she reported. Other than that for – [E.R.] has reported several times they seen her mommy be able to describe her mom having sexual intercourse and I believe [E.R.] specifically had told me and expressed her feelings about seeing – seeing mommy have sex.

*Id.* at 113. When asked if she believed that it was in E.R.'s best interest that Mother's rights be terminated, therapist Young answered affirmatively and stated:

> I believe that because one, [E.R.] can articulate now especially that she feels loved for the first time and those words she can articulate that. She feels safe, she feels like she's in an environment where she can do activities and have fun and be a kid . . . . In the past [Mother] has just not been stable, has been in and out of jail. They've been exposed to a lot.

*Id.* at 117. When asked if it was in M.R.'s best interest to be adopted, she answered affirmatively and stated:

> [W]hen [M.R.] specifically talk[s] a lot about her biological home and knowing that like she loved her – like [Mother] loves her, but not really knowing if she really loved them because of the stuff that she was doing. [M.R.] has articulated that before and that is different in this home. She actual[ly] can report you know that that she feels loved, that she feels safe, that she feels comfortable. Again boundaries, they have boundaries in this home.

*Id.* at 120. When asked if she thought it was in M.R.'s best interest that Mother's rights be terminated as to her, therapist Young answered affirmatively, and when asked if she would recommend any sort of parenting time between Mother and the Children, she answered, "I believe not at this time." *Id.* at 122.

[17] The Children's foster mother, who is a family therapist by occupation, testified that the Children have been with her for six months and that they seem happy and are well-adjusted. When asked if Mother had her contact information, the foster mother responded:

> She has an email address that was created specifically for the children and we had given her the email address, and if she

would email us that we would email her back pictures, stories, whatever we could provide for her. We received one email stating, "I hope I did this right", and so I emailed her back pictures and then we received another email back for the kids, a couple paragraphs. I emailed her back pictures again that was the only time that email address has been used and I check that daily.

*Id.* at 154-155. Brittany Harpe, the Children's current treatment coordinator, testified that she had concerns about Mother's inappropriate conversations and about her ability to redirect and discipline the Children and to provide healthier meals. GAL Walden testified that there was no consistency with Mother's ability to care for the Children or to have stable housing or a support system; that the Children desperately wanted consistency in their life and she could see that when she would visit them as they were very eager for attention; and that Mother would become easily agitated, would become unaware of the surroundings, and would curse and scream at whomever was in the house. She stated that she was there when Mother kicked out the providers and was kicked out also; that when the providers were kicked out, the Children did not appear necessarily scared or affected by it and seemed as if it "kind of rolled off of them"; and that during her time on the case, there were good encounters and bad encounters but Mother's behaviors did not consistently improve. *Id.* at 192.

[18]  Mother testified that DCS became involved when there was a domestic violence incident between her and the alleged father of M.R. and E.R. in the home when they both were present, that she would drive without a valid license with the

Children in the car to DCS required appointments, and that she smoked marijuana when she was pregnant with M.R. and K.R.

[19] On July 13, 2017, the court finished the hearing. Mother, appearing on furlough from her criminal matter in Clay County, testified that she requested to see the Children since she last saw them; that she would be willing to engage in services and work with home-based therapists if available; that therapist Ward helped her to work through her anger issues and to better herself, her attitude, and her drug abuse; that she was currently involved in women's group in the Clay County jail to help with her anger problems; that she had last used marijuana in May 2016, her feelings had changed over time with regards to it, and that she loved being sober. She stated that she has had a "couple [of] altercations with ex's"; that when she knew she had an outstanding warrant, she asked DCS to look into placement options off of a list of two or three people; that her release from Clay County Jail was sixty-eight days away; and that when released from jail, she has a job at a tree service out of Terre Haute and that her boss is letting her move in so she will not have to drive. *Id.* at 246. She testified that it was not her intention to drive without a license again; and that, in January 2017, she was under the impression that services would have been re-referrred to her and had they been, she would have engaged in them.

[20] On August 1, 2017, the court entered its termination order, making detailed findings of fact and concluding that there is a reasonable probability that the conditions that resulted in the Children's removal and continued placement outside the home will not be remedied by Mother, that termination of the

parent-child relationship is in the Children's best interests, and that adoption is a satisfactory plan for the Children.

## *Discussion*

[21] The issue is whether the trial court erred in terminating Mother's parental rights. In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).[7] If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. *See* Ind. Code § 31-35-2-8(a).

---

[7] Subsequently amended by Pub. L. No. 42-2017, § 2 (eff. July 1, 2017).

[22] The State's burden of proof for establishing the allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied*. This is "a 'heightened burden of proof' reflecting termination's 'serious social consequences.'" *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*, 904 N.E.2d at 1260-1261, 1260 n.1). "But weighing the evidence under that heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review." *Id*. We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *Id*. We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id*.

[23] Reviewing whether the evidence clearly and convincingly supports the findings, or the findings clearly and convincingly support the judgment, is not a license to reweigh the evidence. *Id*. "[W]e do not independently determine whether that heightened standard is met, as we would under the 'constitutional harmless error standard,' which require *the reviewing court itself* to 'be sufficiently confident to declare the error harmless beyond a reasonable doubt.'" *Id*. (quoting *Harden v. State*, 576 N.E.2d 590, 593 (Ind. 1991) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967))). "Our review must 'give "due regard" to the trial court's opportunity to judge the credibility of the witnesses firsthand,' and 'not set aside [its] findings or judgment unless clearly

erroneous.'" *Id*. (quoting *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cty. Office*, 989 N.E.2d 1225, 1229 (Ind. 2013) (citing Ind. Trial Rule 52(A))). "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id*. at 640.

A. *Remedy of Conditions*

We note that the involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). Because we find it to be dispositive under the facts of this case, we limit our review to whether DCS established that there was a reasonable probability that the conditions resulting in the removal or reasons for placement of the Children outside the home will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

In determining whether the conditions that resulted in the Children's removal will not be remedied, we engage in a two-step analysis. *E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions, balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that

delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of future behavior. *Id.*

"The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home." *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013) (citation and internal quotation marks omitted). A court may consider evidence of a parent's prior criminal history, history of neglect, failure to provide support, lack of adequate housing and employment, and the services offered by DCS and the parent's response to those services, and, where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances the problematic situation will not improve. *Id.* A trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth are permanently impaired before terminating the parent-child relationship. *In re Z.C.*, 13 N.E.3d 464, 469 (Ind. Ct. App. 2014), *trans. denied*.

Additionally, "Indiana courts have upheld parental rights of incarcerated parents who still had a year or more to serve before possible release," and the Indiana Supreme Court has "not established a bright-line rule for when release must occur to maintain parental rights." *K.E. v. Ind. Dep't of Child Servs.*, 39

N.E.3d 641, 648 (Ind. 2015). "Because the release date alone is not determinative, we consider whether other evidence, coupled with this consideration, demonstrates by clear and convincing evidence a reasonable probability that [an incarcerated parent] would be unable to remedy the conditions for removal." *Id.*

[28] Mother argues that DCS did not present clear and convincing evidence that the conditions resulting in the Children's continued placement outside Mother's home would not be remedied. She asserts that she responded favorably to DCS's services and made strides in her parenting, drug use, and communication problems, that DCS did not make sufficient efforts to ensure she had the services she needed, that the court's reasoning that frequent incarcerations prevent her from remedying conditions is not valid under the Indiana Supreme Court precedent derived from *In re G.Y.*, 904 N.E.2d 1257, 1262 (Ind. 2009), and that, like the mother in *G.Y.*, she demonstrated that she could take care of the Children while incarcerated.

[29] The trial court's order addressed Mother's parenting, drug use, communication problems, incarcerations, and care of the Children while incarcerated, as well as the services provided by DCS. Specifically, the court found that the Children have remained placed outside the home since January 2015, that when residing with Mother, there were concerns about the appropriateness of Mother's parenting with respect to the Children's unaddressed health issues, and that the Children have been removed from the home and placed under the care and supervision of DCS for at least fifteen of the most recent twenty-two months

prior to the termination proceeding filed on May 20, 2015. The court also found:

11. Services were ordered and referred to address substance abuse and stability issues, although [Mother] did not feel she needed services.

12. [Mother] finished a substance abuse assessment after several months. She failed to complete a recommended substance abuse treatment program. [Mother] did not understand why she needed to quit smoking a plant that was not a drug.

13. [Mother] testified at trial she has not smoked marijuana after she was incarcerated in May of 2016, but she has failed to comply with her drug screen referral.

14. [Mother] was mainly compliant with home based therapy geared for stress management, better communication skills, substance abuse recovery support, and parenting skills from March of 2014 until July of 2015, when [Mother] moved out of central Indiana.

15. [Mother's] therapist believed she made strides but recommended therapy continue.

16. [Mother] has attended a weekly women's group since she was incarcerated on June 22, 2017, an approximate three-week period.

17. Stable independent housing has been an issue throughout the CHINS case. [Mother] had two residences but lost both, with the second home being inappropriate for [the Children].

18. Adding to [Mother's] instability is her frequent incarcerations. At the time of trial in this matter she was incarcerated on a recent conviction of Habitual Traffic Violation and her outdate is September 19, 2019.

19. [Mother] has received multiple charges of driving while suspended but appears to keep doing it.

20. Upon her release from incarceration, [Mother] plans on returning to a tree service job and reside with her boss.

21. Due to [Mother's] aggressive behavior, and what could be perceived as delusions, she was referred for a psychological evaluation. Later, after moving, a referral for dual substance abuse and mental health diagnosis was made. This referral was never complied with as a result of [Mother] not having a stable place and five contact numbers were unsuccessful.

22. Parenting time has not taken place since March of 2016, after three cancellations. Prior to parenting time being closed, the visit facilitator had concerns regarding [Mother's] parenting skills.

23. Parenting time was not exercised for several months in 2015.

24. Shortly after Christmas of 2016, the [Children's] foster mother set up an email account for [Mother] and has posted pictures of the [Children]. [Mother] has only sent two emails, and not for several months.

Appellant's Appendix Volume 2 at 35-36.

[30]    The record reveals that the Children were removed from Mother in July 2014 due to Mother's incarceration and inability to provide basic care and supervision. While Mother may have made some progress at certain times, she persisted in using marijuana and driving with a suspended license despite several incarcerations related to that same behavior. FCMs Brinkers and Gadson testified that Mother either evaded or failed to participate in drug screens and did not rectify the issues that initially led DCS to believe that a substance abuse assessment was necessary. Mother also has failed to

demonstrate that she could provide safe housing and basic care consistently. Mother's record in providing housing includes an incident where she was held at gun or knife point in front of the Children and, separately, a location that contained hazards unsafe for young children. Treatment coordinator Harpe testified that she had concerns about Mother's ability to redirect and discipline the Children, FCM Brinkers testified that Mother's parenting involved constant screaming, and GAL Walden testified that Mother's behaviors did not consistently improve.

[31] Based upon the court's findings and the record, we conclude that clear and convincing evidence supports the trial court's determination that there is a reasonable probability that the conditions leading to the Children's removal will not be remedied. *See In re A.H.*, 832 N.E.2d 563, 570-571 (Ind. Ct. App. 2005) (concluding that the trial court properly terminated the parent-child relationship where a parent participated in but failed to benefit from services).

B. *Best Interests*

[32] We next consider Mother's assertion that DCS failed to demonstrate that termination of her parental rights is in the Children's best interests. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the children. *Id.* Children have a paramount need for permanency

which the Indiana Supreme Court has called a central consideration in determining the child's best interests, and the Court has stated that children cannot wait indefinitely for their parents to work toward preservation or reunification and courts need not wait until the child is irreversibly harmed such that the child's physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *In re E.M.*, 4 N.E.3d at 647-648. However, "focusing on permanency, standing alone, would impermissibly invert the best-interests inquiry . . . ." *Id.* at 648. Recommendations of the case manager and court-appointed advocate, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests. *In re A.S.,* 17 N.E.3d 994, 1005 (Ind. Ct. App. 2014), *trans. denied*.

[33]    To the extent Mother cites *In re G.Y.*, the Indiana Supreme Court concluded that termination of a mother's parental rights was not in the child's best interests where mother made a good-faith effort to complete all required services for reunification available to her in prison, obtained suitable housing and gainful employment upon her release, and maintained a consistent and positive relationship with the child. 904 N.E.2d at 1263-1264. The Court observed that mother had delivered cocaine to a police informant a year before the child's birth and that there were no allegations that mother engaged in any criminal behavior during the child's life. *Id.* at 1258. Further, the Court found of particular significance that despite testimony from the case manager and

child advocate regarding the child's need for permanency and stability, the Guardian ad Litem had nevertheless reported observing a mother-child bond between the child and mother and there was no evidence to show that permanency through adoption would be beneficial to the child or that remaining in foster care until reunited with the mother soon thereafter would be harmful.[8] Unlike the parent in *G.Y.*, Mother has committed several, similarly-related offenses after the birth of the Children and has neither exercised parenting time since March 2016 after three cancellations nor corresponded with the Children despite the foster mother's efforts.

[34] This Court has previously recognized that "[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied*. Based on the testimony from FCM Gadson and therapist Young, as well as the totality of the evidence in the record and as set forth in the court's termination order, we conclude that the court's determination that termination is in the best interests of the Children is supported by clear and convincing evidence. *See In re A.I.*, 825 N.E.2d 798, 811 (Ind. Ct. App. 2005) (concluding that testimony of child advocate and family case manager, coupled with evidence that conditions resulting in continued placement outside home will not be remedied, is

---

[8] The Court issued the decision in April 2009 and had stated at oral argument that the mother's counsel confirmed that her projected release date was June 2009 and maybe as early as May. 904 N.E.2d at 1262-1263.

sufficient to prove by clear and convincing evidence termination is in child's best interests), *trans. denied*.

## *Conclusion*

[35] We conclude that the trial court's judgment terminating the parental rights of Mother is supported by clear and convincing evidence. We find no error and affirm.

[36] Affirmed.

Baker, J., and Riley, J., concur.